**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-163 (CKK)** |
| **v.** | : | |
| | : | |
| **JON LIZAK,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Jon Lizak to 75 days' incarceration, and $500 in restitution.

## I.      Introduction

Defendant Jon Lizak, twenty-two year old former legislative aide to a New York State Representative and current assistant director of a daycare facility in Merrick, New York, a town on Long Island, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Lizak pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 75 days' incarceration is appropriate in this case because Lizak: (1) along with four accomplices, entered the Capitol Building through the Senate Wing Door only minutes after it was initially breached; (2) traveled far and wide inside the Capitol Building, including inside the office suite of then Speaker of the House Nancy Pelosi; (3) remained inside the U.S. Capitol building for approximately 30 minutes; (4) stood by while a member of his group rammed a bicycle rack into a police officer; (5) participated in the chaos as his group removed media items damaged by other rioters; and (6) has, to date, expressed no remorse for his unlawful conduct on January 6.

The Court must also consider that Lizak's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. The facts and circumstances of Lizak's crime support a sentence of 75 days' incarceration and $500 in restitution in this case.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 63 (Statement of Offense), at 1-7.

### Lizak's Role in the January 6, 2021 Attack on the Capitol

The FBI investigated Lizak and his co-defendants Joseph Brody, Thomas Carey, Gabriel Chase, and Paul Ewald Lovley for illegal acts committed on January 6, 2021 at the U.S. Capitol

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

grounds and inside the U.S. Capitol building.[2]   The group, all members at the time of America First,[3] decided to heed the call by America First leadership to attend rallies in Washington D.C. The next morning they went to Washington D.C. to attend the former President's rally.

Afterwards, the group went to the Capitol grounds and entered the U.S. Capitol building very shortly after it had been breached by rioters.   Their movements inside the U.S. Capitol building were captured by surveillance cameras and open-source videos.   In Image 1, below, Lizak, wearing a white coat with fur trim and a baseball cap, is circled in **<span style="color:green">green</span>**, Lovley is circled in **<span style="color:orange">orange,</span>** Carey is circled in **<span style="color:purple">purple</span>**, Chase is circled in **<span style="color:blue">blue</span>**, and Brody is circled in **<span style="color:red">red</span>**.



Image 1

---

[2] Carey, Lovley, and Chase pled guilty to the same charges. Carey and Lovley received 36 months' probation and 14 days' intermittent confinement.   Chase received 36 months' probation and 3 days' intermittent confinement.   The charges against Brody are still pending resolution.

[3] "Through his nightly 'America First' show and his America First Foundation, [Nick] Fuentes has stated his aim is to remake the Republican Party into 'a truly reactionary party.' In livestreams and public appearances, Fuentes has described his goal as working within the political system to become 'the right-wing flank of the Republican Party.' He sees America's 'white demographic core' as central to its identity." https://www.splcenter.org/fighting-hate/extremist-files/individual/nick-fuentes, visited March 23, 2023.

The group entered the U.S. Capitol building through the Senate Wing Doors along with many other rioters at approximately 2:16 p.m. that day.  *See* Image 2, below.  Rioters first breached those doors by smashing out the adjacent windows and climbing through them, then opening the doors from the inside, approximately three minutes earlier.



Image 2

The group then proceeded towards the Crypt.  After a few minutes, the crowd of rioters, which included Lizak and his compatriots, pushed past police officers in the Crypt and proceeded south into a room containing busts of historical figures, known as the "Corridor of Honorary Citizens."  *See* Image 3, below.



Image 3

The group moved with the crowd down the hallway and near several offices, including the "Office of the Clerk," and the "Office of the Majority Leader | Steny H. Hoyer." *See* Figures 4 through 6, below



Image 4



Image 5



Image 6

The group reentered the Crypt and then entered a room containing a spiral stairwell. As the group of rioters ascended the stairwell, some were ominously chanting, "NANCY! NANCY! NANCY!," in an obvious reference to then Speaker of the House Nancy Pelosi. At the top of the stairwell, the rioters continued forward and entered a small atrium, which displayed a plaque reading, "Speaker of the House | Nancy Pelosi." The group, including Lizak, entered a conference room within Speaker Pelosi's Office. *See* Image 7, below.



Image 7

The group left Speaker Pelosi's Office and entered the Rotunda.  The group loitered within the Rotunda for several minutes.  At approximately 2:42 p.m., after departing the vicinity of the Rotunda, the group marched together and ascended the House Gallery Stairs to the third level of the Capitol, where they proceeded through the Senate East Corridor.  They proceeded to the Senate Chamber and stopped outside of the doors labeled respectively as Secretary of the Senate's Office and the Senate Gallery Door Number 1. *See* Image 8, below.



Image 8

The Senate Chamber—where part of the Joint Session for the Electoral College Certification vote would normally have been taking place, in accordance with 3 U.S.C. § 15, and the 12th Amendment to the U.S. Constitution—was instead filled with rioters. Brody broke off from his group of associates and entered the Senate Chamber, where his actions were captured by several Senate Recording Studio cameras. While in the Chamber, Brody appeared to hold a cell phone in his hand and photograph or record the interior of the Senate Chamber—to include documents or other information on and inside several desks. *See* Image 9, below.


Image 9

While Brody breached and remained in the Senate Chamber, Lizak and the others remained outside.  Finally, at approximately 2:50 p.m., the group began to exit the Capitol through the Senate Carriage Door.  Carey exited the building at approximately 2:50 p.m., followed by Lovley and Chase 20 seconds later.  Approximately a minute and a half later, at 2:51:40 p.m., Brody and Lizak exited the Capitol. *See* Figures 10 through 13, below.


Image 10



Image 11



Image 12



Image 13

Eventually, the group moved to the north side of the Capitol.  There, they saw Brody lifting

a metal barricade and appearing to use it to obstruct or assault a police officer. Brody pushed the

bike rack  over a concrete stanchion and against a police officer who was using what appeared to be chemical-irritant spray to impede the advance of the crowd of rioters.  Lizak looked on from just inches away from that bike rack, as shown below.  *See* Image 14.


Image 14

At one point, Chase appeared to spray something at the entrance to the Capitol Building.


Image 15

After the attempted breach of North Door into the U.S. Capitol building, the group moved to an area near the Capitol Building where news media had set up broadcasting equipment. Metal barricades had been erected around the equipment. A group of rioters had breached the metal barricade and destroyed and looted the media equipment. Brody and some others took some items from the pile of damaged media equipment. *See* Figures 16 and 17, below.



Image 16



Image 17

*Lizak's Interview*

After his arrest, Lizak spoke to FBI agents about the events of January 6, 2021.  He confirmed his and his group's prior involvement with America First, his attendance at the January 6, 2021 rallies in Washington D.C., his trespass into the U.S. Capitol building with his group and other rioters, and their actions outside of the building in the media area.

*The Charges and Plea Agreement*

On September 12 2022, the United States charged Lizak by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On September 15, 2022, law enforcement officers arrested him his home in New York. On May 22, 2023, the United States charged Lizak by a one-count Information with violating 40 U.S.C. § 5104(e)(2)(G). On May 22, 2023, pursuant to a plea agreement, Lizak pleaded guilty to Count One of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

13

### III.     Statutory Penalties

Lizak now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 75 days' incarcerationand $500 in restitution.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Lizak's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Lizak, the absence of violent or destructive acts is not a mitigating factor. Had Lizak engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Lizak's case is that he and his group spent significant time in the U.S. Capital building, accessing and entering numerous sensitive areas including

Speaker of the House Pelosi's conference room. Furthermore, Lizak also stood by as a member of his group assaulted an officer with bike rack and participated in the pillaging of destroyed media equipment.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of Lizak

Lizak has no criminal history and has been compliant under Pretrial Supervision.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most

compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37). There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The Government's recommended sentence should also discourage Lizak from engaging in such activity in the future. Given his group's actions that day both inside and outside the U.S. Capitol building, it is even more important that he be deterred and supervised.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Lizak based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Lizak has pleaded guilty to Count One of the Information, charging him with violation of 40 U.S.C. § 5104. This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those

cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For

that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Virginia Spencer*, 21-cr-147 (CKK), the defendant and her husband were part of a group that entered the Capitol building, moved to the Crypt, overran the officers there, then walked into the hallways of Speaker Pelosi's office (but not, like Lizak, into any of those offices).  Spencer and her husband tried to enter the House Chamber when Members of

Congress were still sheltering in place.  Spencer minimized her conduct during an FBI interview.
Perhaps worst of all, she brought her minor child into the Capitol on January 6.  Like Lizak,
Spencer pleaded guilty to a single violation of 18 U.S.C. § 5104(e)(2)(G).  This Court sentenced
Spencer to 90 days' incarceration.

In *United States v. Devin Rossman*, 22-cr-280 (BAH), the defendant entered the Capitol
Building through the Senate Wing Door just minutes after the initial breach, and remained in the
Capitol building for approximately almost two hours. He traveled through the Crypt and entered
the Speaker's office suite, where he took photographs.  He tried to open doors while the Speaker's
terrified staffers sought shelter under their desks.  He expressed little remorse for his actions.  Chief
Judge Howell sentenced Rossman to 32 days' intermittent confinement in addition to probation
and community service.

In *United States v. Erik Rau* (21-CR-467 (JEB)) and *United States v. Derek Jancart* (21-
cr-148 (JEB)), the defendants entered the Capitol approximately 5 minutes after the initial breach,
formed part of the critical mass of rioters in the Crypt who surged past the police, entered Speaker
Pelosi's office suite, and spent approximately 40 minutes in the Capitol.  At one point, Rau taunted
the police officers defending the Capitol, stating "we have you surrounded."  Rau and Jancart, like
Lizak and his group, went into the Speaker's conference room. After the riot, Rau and Jancart
deleted incriminating material from their mobile telephones.  They pleaded guilty to violating 40
U.S.C. § 5104(e)(2)(D), disorderly conduct inside the Capitol Building.  Judge Boasberg sentenced
both Rau and Jancart to 45 days incarceration.  This Court sentenced Lizak's accomplices Carey
and Lovely to 14 days of intermittent incarceration (7 weekends) and Chase to only 3 days
incarceration. But it also sentenced all three of those defendants to 36 months' probation.  In the
cases of Carey, Lovely, and Chase, the Government requested 60 days' imprisonment and 3 years

supervised release.  However, the Government is requesting a longer period of incarceration of 75 days in Lizak's case, not because of Lizak's actions or background differed significantly than Carey, Lovely, or Chase, but in light of the D.C. Circuit's intervening decision in *United States v. James Little*, __ F.4th __, No. 22-3018, 2023 WL 5313529 (August 18, 2023). Under *Little*, this Court may no longer impose a "split sentence" of both probation and incarceration on a single petty misdemeanor.  However, the Appellate Court in *Little* did recognize the Government's argument that 18 U.S.C.§ 3563(b)(10) allows a defendant on probation to "remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time."  See *Little*, 2023 WL 5313529 at 7 n. 7.  The Appellate Court noted that the statute contemplated a short period of confinement like nights and weekend.  See *id*.  Thus, the Government makes its recommendation in this case consistent with *Little* to reflect a need to deter future criminal actions that supervision would have ensured.  At the same time, the Government believes that the Court, if it chooses to sentence Lizak like Carey, Lovely, and Chase, can impose intermittent confinement as it has with Carey, Lovely, and Chase, as a short period of confinement consistent with *Little* and 18 U.S.C.§ 3563(b)(10).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence

differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Lizak must pay $500 in restitution, which reflects in part the role Lizak played in the riot on January 6.[6] Plea Agreement at ¶ 10. As the plea agreement reflects,

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," and any offense "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can

the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.*  Lizak's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 10.

## VI.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 75 days' incarceration and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

<div style="margin-left:40%;">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      s/ *Joseph Huynh*
Assistant United States Attorney
D.C. Bar No. 495403
Assistant United States Attorney (Detailed)
405 East 8th Avenue, Suite 2400
Eugene, Oregon 97401-2708
Joseph.huynh@usdoj.gov

</div>

---

be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

**<u>CERTIFICATE OF SERVICE</u>**

On this 31 day of August 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

<div align="right">

 /s/ *Joseph Huynh*
Assistant United States Attorney
D.C. Bar No. 495403
Assistant United States Attorney (Detailed)
405 East 8th Avenue, Suite 2400
Eugene, Oregon 97401-2708
Telephone: (541) 465-6771
Joseph.Huynh@usdoj.gov

</div>